United States District Court
Middle District of Florida
Orlando Division

JOSH HOOPER,

   *Plaintiff,*

V.            NO. 6:16-CV-1978-ORL-41PDB

ACTING COMMISSIONER OF SOCIAL SECURITY,

   *Defendant.*

---

## Report & Recommendation

This is a case under 42 U.S.C. § 405(g) to review a final decision of the Acting Commissioner of Social Security denying Josh Hooper's claim for disability-insurance benefits.[1] Hooper seeks reversal and remand based on the Administrative Law Judge's ("ALJ's") findings concerning his impairments, residual functional capacity ("RFC"), and past relevant work. Doc. 18.

---

[1] The Social Security Administration ("SSA") uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of a denial of benefits. *Bowen v. City of New York*, 476 U.S. 467, 471−72 (1986). A state agency acting under the Commissioner's authority makes an initial determination. 20 C.F.R. §§ 404.900−404.906. If dissatisfied with the initial determination, the claimant may ask for reconsideration. 20 C.F.R. §§ 404.907−404.918. If dissatisfied with the reconsideration determination, the claimant may ask for a hearing before an Administrative Law Judge ("ALJ"). 20 C.F.R. §§ 404.929−404.943. If dissatisfied with the ALJ's decision, the claimant may ask for review by the Appeals Council. 20 C.F.R. §§ 404.967−404.982. If the Appeals Council denies review, the claimant may file an action in federal district court. 20 C.F.R. § 404.981. Section 405(g) provides the basis for the court's jurisdiction.

## I.     Background

Hooper was born in 1962 and last worked in October 2012, when he retired. Tr. 185, 230. He has some college education and experience as a police officer and police captain. Tr. 43–46, 62. He alleges he became disabled in October 2012 from post-traumatic stress disorder ("PTSD"), a lumbar injury, hypertension, gastroesophageal reflux disease, chronic bronchitis, headaches, and nerve damage in his elbows, hands, neck, and lower back.[2] Tr. 229–30. He is insured through 2017. Tr. 194, 205. He proceeded through the administrative process, failing at each level. Tr. 1–6, 20–29, 75–101, 104–07, 109–14. This case followed. Doc. 1.

## II.    ALJ's Decision

The ALJ entered a decision on June 1, 2016. Tr. 29.

At step one,[3] the ALJ found Hooper has not engaged in substantial gainful activity since October 2012 (the alleged onset date). Tr. 22.

At step two, the ALJ found Hooper suffers from severe impairments of cervicalgia; degenerative disc disease of the lumbar spine, status post-lumbar surgery; and status post-right-shoulder surgery. Tr. 22. She found his PTSD, major depressive disorder, anxiety disorder, and alcohol/substance abuse addiction are non-

---

[2]To obtain benefits, a claimant must demonstrate he is disabled. 20 C.F.R. § 404.1512(a). A claimant is disabled if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

[3]The SSA uses a five-step sequential process to decide if a person is disabled, asking whether (1) he is engaged in substantial gainful activity, (2) he has a severe impairment or combination of impairments, (3) the impairment meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1, (4) he can perform any of his past relevant work given his residual functional capacity ("RFC"), and (5) there are a significant number of jobs in the national economy he can perform given his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4). The claimant has the burden of persuasion through step four. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

severe. Tr. 22. In doing so, she considered the "paragraph B" criteria[4] and found he has mild difficulties in activities of daily living; mild difficulties in social functioning; and mild difficulties maintaining concentration, persistence, and pace; and has had no episode of decompensation of extended duration. Tr. 23–24.

At step three, the ALJ found Hooper has no impairment or combination of impairments that meets or medically equals the severity of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 23.

After stating she had considered the entire record and summarizing medical evidence, the ALJ found Hooper has the RFC to perform "a reduced range of light work":[5]

> Specifically, the claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for a total of six hours in an eight-hour day, and sit for a total of six hours in an eight-hour day. The claimant is able to occasionally climb ladders/ropes/scaffolds. The claimant is able to occasionally stoop, kneel, crouch, and crawl. Additionally, the claimant must avoid concentrated exposure to hazards, such as machinery and heights.

Tr. 24.

---

[4]The criteria in paragraph B are used to assess functional limitations imposed by medically determinable mental impairments. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(C). Paragraph B requires a disorder of medically documented persistence resulting in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulty maintaining social functioning; (3) marked difficulty maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpart P, App'x 1 §§ 12.04, 12.06.

[5]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

At step four, the ALJ found Hooper can perform his past relevant work as a police captain as that position is generally performed. Tr. 28. She therefore found no disability. Tr. 28.

## III. Standard of Review

A court's review of an ALJ's decision is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports his findings. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial evidence is "less than a preponderance"; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* A court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Id.* If an ALJ committed an error of law, the court must remand the case to the Commissioner. *Jamison v. Bowen,* 814 F.2d 585, 588 (11th Cir. 1987).

## IV. Law & Analysis

### A. *Mental Impairments*

In his first and second issues, Hooper complains about the ALJ's analysis of his mental impairments. Doc. 18 at 17–22.

After his retirement from law enforcement, beginning in April 2014, and continuing to at least February 2016 (the date of the last record), Hooper visited Circles of Care for mental health treatment at least fourteen times. Tr. 350–80 (Ex. 2F); Tr. 611–18 (Ex. 9F).

At Circles of Care, Hooper saw Rehan Farooqui, M.D., Todd Gates, D.O., and Mathew Sajida, M.D. Tr. 350–80; Tr. 611–18. They diagnosed him with anxiety disorder, major depressive disorder, and PTSD. Tr. 352, 355, 358, 360, 362, 364, 366, 368, 370, 374, 378, 612, 615. They prescribed medications for the impairments and their symptoms. Tr. 353, 356, 359, 361, 363–65, 367, 369, 371, 373, 375, 379–80, 613–

14, 616. Eventually, Dr. Gates opined, it "is very clear that there is a problem with substance abuse and dependence." Tr. 363.

Global Assessment of Functioning ("GAF") ratings[6] made during the visits were usually 55 (indicating moderate symptoms or impairments), but sometimes 60 (also indicating moderate symptoms or impairments) and 65 (indicating mild symptoms or impairments), and once as low as 49 (indicating serious symptoms or impairments). Tr. 352, 355, 358, 360, 362, 364, 366, 368, 612, 615.

Mental status examinations performed during the visits showed normal functioning in many areas but issues in some areas: only fair insight and judgment in April 2014; struggles with anxiety and reports of significant problems with focus

---

[6]The former version of American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000), includes the GAF scale used by mental-health practitioners to report "the clinician's judgment of the individual's overall level of functioning" and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." Manual at 32−34. A GAF rating of 41 to 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF rating of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.*

The latest edition of the Manual has abandoned the GAF scale because of "its conceptual lack of clarity … and questionable psychometrics in routine practice." Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013). In July 2013, the SSA issued Administrative Message (AM)-13066, providing its adjudicators, including ALJs, with internal guidance regarding the interpretation of GAF scores. Soc. Sec. Admin., Global Assessment of Functioning (GAF) Evidence in Disability Adjudication, AM−13066 (July 22, 2013) REV (Oct. 14, 2014). AM-13066 acknowledged DMS-5 eliminated the use of the GAF scale but confirmed that adjudicators will continue to consider GAF ratings as opinion evidence. As with other opinion evidence, a GAF rating needs supporting evidence to be given much weight. *Id.* According to AM-13066, "the extent to which an adjudicator can rely on the GAF rating as a measure of impairment severity and mental functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise." *Id.* The SSA cautions a "GAF rating is never dispositive of impairment severity," and an ALJ should "not give controlling weight to a GAF from a treating source unless it is well supported and not inconsistent with the other evidence." *Id.*

and concentration in May 2014; a mildly nervous affect and only fair insight and judgment in June 2014; difficulty concentrating, nightmares, flashbacks, and intrusive unwanted memories of traumas in July 2014; increased anxiety and mild depression in January 2015; an overly medicated appearance, slurred speech, a dull flat affect, and mildly impaired concentration in July 2015; a highly anxious and very depressed presentation and negative preoccupation in July 2015; a "down" mood and limited insight and judgment in July 2015; and limited insight and judgment in January and February 2016. Tr. 352–53, 355, 364, 368, 370, 372, 374, 378, 615, 612.[7]

---

[7]For the mental status examinations, see Tr. 378 (**April 2, 2014**: "He is a 52-year-old white male who is casually dressed. Good hygiene. Cooperative and courteous. Alert and oriented to time, person, place, and purpose. Sits comfortably in the chair. Shows no signs of psychomotor agitation or retardation. He describes his mood [as] nervous. Affect is congruent. Thought process is logical and goal directed, mainly revolves around his chronic struggle with increased anxiety symptoms. He denies any suicidal or homicidal ideation. Denies any plan or intent to harm … himself or anyone else. No report of any experience of psychotic symptoms. His insight and judgment are fair. Memory is intact. Cognitive capacity to consent for medication is intact."); Tr. 374 (**April 21, 2014**: "Alert and oriented to time, person, place, and purpose. Cooperative and courteous, 52-year-old white male, who describes his mood "so-so." Affect is full, bright, and reactive. Thought process is logical and goal-directed, mainly revolves around his continued struggle with anxiety symptoms. Stating trouble with staying focused and concentrate[ing]. Denies any suicidal or homicidal ideation. Denies any plan or intent to harm himself or anyone else. No report of any experience of psychotic symptoms. His insight and judgment are fair. Memory is intact. Cognitive capacity to consent for medication is intact."); Tr. 372 (**May 12, 2014**: "Alert and oriented to time, person, place, and purpose. Cooperative and courteous, casually dressed. Looks to be his stated age. Describes his mood as "not too good." Affect is nervous. Thought process is logical and goal-directed, mainly revolves around his continued struggles with anxiety, limited response from the medications in the past, and now he also believes that he is having significant problems with focus and concentration. Several times, he inquired about the use of *Ritalin*[.]"); Tr. 370 (**June 9, 2014**: "Alert and oriented to time, person, place, and purpose. Cooperative and courteous, casually dressed. Looks to be his stated age. He describes his mood "so-so." Affect is mildly nervous. Thought process is logical and goal directed, mainly revolved around his complaint of side ffect with the *Brintellix*. Denies any suicidal or homicidal ideation. No report of any psychotic symptoms. Insight and judgment are fair. Memory is intact. Cognitive capacity to consent for medication is intact."); Tr. 368 (**July 29, 2014**: "He is a very polite, cooperative individual. He is very hypervigilant, anxious. His speech is fluent, coherent, without abnormality. He is cognitively intact. He has difficulty concentrating. Denies any auditory or visual hallucinating. He does have nightmares, flashbacks, and intrusive unwanted memories of traumas. Denies any suicidal or homicidal ideation. He

In a record from a visit on February 24, 2016, Dr. Mathew noted,

[Hooper's] wife called several days ago, concerned about his depressive symptoms, and had indicated that they had planned for him to get voluntarily admitted to a hospital/residential facility. He stated today,

is oriented in all spheres. Immediate, recent, and ancient memories are well preserved."); Tr. 367 (**August 26, 2014**: "Patient['s] … affect of the brighter. Impulse control and judgment are excellent. No psychotic processes are evidence. Overall improvement is appreciated. His assessments are unremarkable."); Tr. 364 (**January 16, 2015**: "Patient appearing more anxious mildly more depressed. Denies any suicidal or homicidal ideation. No psychotic processes are evidence. The remainder of the exam is unremarkable."); Tr. 362 (**March 12, 2015**: "Patient presented in a cooperative fashion[.] [H]e tried to minimize his dependence on opiates, [] [benzodiazepines], and alcohol use. He denied any homicidal or suicidal ideation. He denied any psychotic processes. The remainder of the evaluation was unremarkable."); Tr. 360 (**April 3, 2015**: "Patient is … effectively brighter, sleeping well, and overall improved. He denies any homicidal or suicidal ideation. No psychotic processes are [apparent]. Impulse control and judgments seem to be satisfactory. His evaluation is much improved."); Tr. 358 (**May 29, 2015**: "Patient appears to be overly medicated with a dull flat affect. Speech is mildly slurred. Concentration seems to be mildly impaired. Denies any auditory or visual hallucinations. Denies any homicidal or suicidal ideation. His impulse control and judgments seem to be acceptable at this time. The remainder of the exam is unremarkable."); Tr. 355 (**July 10, 2015**: "Patient presented highly anxious very depressed with a negative preoccupation. He [has] lost the initiative to engage in activities as the result of his pain. He denies auditory or visual hallucinations. No psychotic processes are evident. Impulse control and judgment are satisfactory. Cognitive functions are intact. The remainder of the assessment is unremarkable."); Tr. 352–53 (**July 27, 2015**: "He appears his stated age. Grooming and hygiene is fair. No abnormal involuntary movements were noted. No psychomotor agitation or retardation noted. Eye contact is good. Mood is down. Affect is appropriate and mood congruent. Speech is normal rate, rhythm and volume. Thought process is goal oriented. No delusions or abnormal perceptions were reported. He denies suicidal and homicidal ideation. He's alert and oriented times 3. Memory is grossly intact. Insight and judgment is limited. He is motivated for treatment and able to consent."); Tr. 615 (**January 29, 2016**: "He appears his stated age. Groom and hygiene is fair. Mood down. Affect is appropriate and mood congruent. Speech is spontaneous and coherent. Thought process is goal oriented. No delusions or abnormal perceptions were reported. He denies suicidal and homicidal ideation. He's alert and oriented times 3. Memory is grossly intact. Insight and judgment is limited. He is motivated for treatment and is able to consent."); and Tr. 612 (**February 24, 2016**: "He appears his stated age. Grooming and hygiene is fair. Mood down. Affect is appropriate and congruent. Speech is spontaneous and coherent. Thought process is goal oriented. No delusions or abnormal perceptions were reported. He denies suicidal and homicidal ideation. He's alert and oriented times 3. Memory is grossly intact. Insight and judgment is limited. He is motived for treatment and able to consent.").

that they are still looking at options. He reported that he is feeling better than he was at that time. He continues to feel depressed, have poor energy and motivation, anhedonia, and difficulty functioning, but denies suicidal thoughts. He stated that pain is also less controlled. Discussed medication trials including brintellix, but he stated that he does not want to take anymore medications. Past medication trials has been ineffective, or he has not been able to tolerate it. He denies drug or alcohol abuse. He stated his wife is very supportive. He denies aggressive or suicidal thoughts.

Tr. 612.

Hooper's wife provided two third-party functional reports. Tr. 210–17, 264–79. In one from August 2015, she included that Hooper "cannot con[c]entrate for very long on any task because the pain is very distracting"; he "lays in the recliner chair [or] bed" and does "very little else"; he used to do all of the cooking and grocery shopping but can now only make sandwiches; he sometimes forgets to pay the bills; they used to go to the beach, dine out, ride bikes, boat, fish, and walk, but now he only watches television; his conversations become "sporadic" and "bounce[] to other topics without notice"; he "starts to do chores and stops completely"; he "can only follow a very short list with simple instructions w/out distraction"; he does not handle stress well because the "pain causes guilt and he feels sad about all the things he cannot help with"; and he has begun "strange habits" like making throat noises and eating more desserts than he ever has. Tr. 210–16. She concluded, "He used to be a police officer—strong, attentive to detail, a leader. He used to take care of all things around the house. Now he can do nothing[.]" Tr. 217. She provided a similar statement on another occasion (the date is unclear). Tr. 264–79.

The record also includes a summary of an interview of Hooper's wife in September 2015. Tr. 248 (Exhibit 8E). The interviewer conveyed that Hooper's wife had provided the following information. Hooper has a driver's license and owns a car. Tr. 248. She drives him to appointments and errands, but because she has a fulltime job, he sometimes has to drive himself. Tr. 248. He takes care of his personal hygiene and grooming and takes his medication without help. Tr. 248. He manages the money,

and she checks, hoping he is doing okay. Tr. 248. He does small chores (the dishes, some laundry, and some light cleaning). Tr. 248. He uses the computer for online banking and email. Tr. 248. Because he is "in a lot of pain," he does little during the day and no longer grocery shops. Tr. 248. He "jumps around [a lot] and does not concentrate as well as he used [to]." Tr. 248. He does not really watch movies with a storyline anymore. Tr. 248. He gets along well with other people. Tr. 248.

For the initial benefits determination, the Social Security Administration ("SSA") considered a report from Judith Meyers, Psy. D., a state-agency consultant. Tr. 75–86 (Exhibit 1A). She reviewed the records from Circles of Care up to August 2015. Tr. 77. In her "Findings of Fact and Analysis of Evidence," she describes only one record from Circles of Care (the record of the visit on July 27, 2015). Tr. 79. She identified Hooper's mental impairments as "Affective Disorders," "Anxiety Disorders," and "Alcohol, Substance Addiction Disorders" and opined each was "Non Severe." Tr. 80. For the paragraph B criteria, she opined he has mild difficulties in activities of daily living; mild difficulties in social functioning; and mild difficulties maintaining concentration, persistence, and pace; and has had no episode of decompensation of extended duration. Tr. 80. Under "Additional Explanation," she partially describes the record from Circles of Care she had described earlier, part of another record from Circles of Care that indicated his wife's concern about his pain management with opioids and past alcohol abuse (a record of a visit on March 12, 2015), and the summary of his wife's September 2015 interview. Tr. 81. Dr. Meyers opined his "[l]imitations [are] primarily physical, not severe mentally." Tr. 81.

For the reconsideration determination, the SSA considered a report from John Thibodeau, Ph.D., another state-agency consultant. Tr. 93–100 (Exhibit 3A). He reviewed the records from Circles of Care up to October 2015. Tr. 90. In his "Findings of Fact and Analysis of Evidence," he describes two records from Circles of Care.[8] Tr.

---

[8] Dr. Thibodeau describes records from Circles of Care from **September 8, 2015** ("Eye contact good, mood low and anxious, affect appropriate and moot congruent. Thought process is goal oriented. Alert and oriented. Memory intact. Insight and

93. He identifies the same mental impairments and provides the same opinions as Dr. Meyers. Tr. 93–94. Under "Additional Explanation," he partially describes the two records from Circles of Care he had described earlier and repeats Dr. Meyers's partial description of some of the other records. Tr. 94.

At step two, the ALJ found Hooper's mental impairments are non-severe. Tr. 22. She explained:

> The claimant's medically determinable mental impairments of major depressive disorder, post traumatic stress disorder, anxiety disorder, and alcohol/substance abuse addiction, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.
>
> The record reflects the claimant's mental health treatment at Circles of Care for symptoms of major depressive disorder, post[-]traumatic stress disorder, anxiety disorder, and substance[-] abuse disorder (Exhibits 2F, 9F). Despite the claimant's subjective allegations, a mental status evaluation performed on July 10, 2015[,][9] indicated that the claimant's grooming and hygiene were fair. There was no evidence of psychomotor agitation or retardation noted. While the claimant's mood was down, his affect was appropriate and he maintained good eye contact. The claimant's speech was normal in rate, rhythm, and volume. The claimant's thought process was goal oriented. There were no delusions or abnormal perceptions reported. On the contrary, the claimant was alert and oriented in three spheres. The claimant's memory was grossly intact (Exhibit 2F/Pages 3, 4). Notably, the claimant denied illicit use of prescription drugs and alcohol abuse (Exhibit 2F/Page 3). According to a subsequent psychiatric evaluation performed on October 7, 2015, the claimant denied memory loss, suicidal ideation, hallucinations,

---

judgment limited."), and **October 23, 2015** ("Mood low. Affect appropriate and mood congruent. Thought process goal oriented. Alert and oriented. Memory intact. Insight and judgment limited."). Tr. 93. It is unclear where records of these visits are in the record. They do not appear to be in Exhibits 2F or 9F where the records of other visits to Circles of Care are. *See* Tr. 350–80, 611–18.

[9]Although the ALJ states the treatment note is from July 10, 2015, her description of it is consistent with the note from July 27, not July 10. *Compare* Tr. 23 *with* Tr. 352–54 *and* Tr. 355–56.

paranoia, and phobias (Exhibit 5F/Page 4).[10] Based on the foregoing, the undersigned has concluded that the claimant's major depressive disorder, post[-]traumatic stress disorder, anxiety disorder, and alcohol/substance abuse addition are not severe impairments within the meaning of the Social Security Act, as amended.

In making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders … known as the "paragraph B" criteria.

The State agency psychological consultants at Exhibits 1A and 3A concluded that the claimant's mental impairments resulted in mild restrictions of activities of daily living, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. While not opinion evidence, the undersigned finds that these determinations are supported by the medical evidence and are consistent with the record as a whole.

Accordingly, the undersigned finds that the claimant has only mild restrictions of activities of daily living. The record reflects that the claimant was able to take care of his personal hygiene and grooming. He was able to take his medication without assistance. Additionally, the claimant was capable of performing light household chores, including dishes, laundry, and light cleaning (Exhibit 8E/Page 1).

In social functioning, the claimant has mild difficulties. The record reflects that the claimant gets along well with other people (Exhibit 8E/Page 1).

With regard to concentration, persistence or pace, the claimant has mild difficulties. The record reflects that the claimant is able to use a computer for only banking and email. Additionally, the claimant is able to manage his money (Exhibit 8E/Page 1).

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. ….

---

[10]In referring to a "subsequent psychiatric evaluation," the ALJ is referring to Hooper's visit with Jonathan Paine, M.D., P.A., with the Neurological Surgery Center for a follow-up from a discogram and bone scan. Tr. 428–33. In a report of the visit, Dr. Paine noted under "Review of Symptoms," and "Psych," that Hooper "[c]omplains of depression, anxiety and confusion" but "[d]enies memory loss, suicidal ideation, hallucinations, paranoia and phobia." Tr. 431.

> Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere.

Tr. 23–24.

Later in the opinion, the ALJ summarizes Hooper's testimony concerning his physical and mental impairments. Tr. 25. On mental impairments, she states:

> [T]he claimant alleged that he suffered from mental impairments, including [PTSD]. The claimant alleged short-term memory. The claimant also reported that he had difficulty being around other people. The claimant reported that he had suicidal ideation and crying spells. According to the claimant, he lies down 18+ hours a day due to his pain and mental conditions. The claimant took prescribed psychotropic medications and reported significant side effects.

Tr. 25. The ALJ found Hooper's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," but his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the … evidence[.]" AR 25. The ALJ then explained why she was not fully crediting Hooper's testimony concerning his physical impairments. Tr. 25–28.

Hooper argues substantial evidence does not support the ALJ's finding his mental impairments are non-severe and RFC omitting any mental limitations. Doc. 18 at 17–22. He observes three doctors diagnosed him with mental-health disorders, he saw them for nearly two years, they prescribed more than nine combinations of psychiatric medications, they noted "significant symptoms and limitations" in all but two mental-status examinations, and his mental health became so bad that involuntary hospitalization was eventually considered. Doc. 18 at 17–21. He argues, "Any deficits in concentration, attention, focus, decision making, social interaction, [or] motivation would impact [his] ability to work as a police officer or a police captain. No reasonable person would say that an anxious, depressed individual with

concentration problems who is on high levels of psychiatric medication and narcotic pain medication should be working in law enforcement or security work in any capacity." Doc. 18 at 21.

Hooper observes the ALJ failed to consider the GAF ratings indicating his treating doctors' view he had at least moderate symptoms or impairments most of the time. Doc. 18 at 18. Hooper further observes that the ALJ, in finding his impairments non-severe, discussed the record of only a single visit to Circles of Care (the record of the visit on July 10, 2015), the visit with Dr. Paine for a follow-up from a discogram and bone scan, and the summary of his wife's interview, with no explanation of why she had omitted discussion of the remaining records. Doc. 18 at 18.

Hooper argues the ALJ's discussion of even those three records is flawed. Doc. 18 at 18. On the single visit to Circles of Care, Hooper observes the ALJ described only normal findings even though the record from that visit indicates he had arrived severely depressed and in excruciating pain and the mental status examination had indicated he was "highly anxious [and] very depressed," had "negative preoccupation," and "has lost the initiative to engage in activities as a result of pain." Doc. 18 at 18–19; *see* Tr. 355. On the visit with Dr. Paine for a follow-up from a discogram and bone scan, Hooper observes the ALJ erroneously described it as a "subsequent psychiatric evaluation" even though Dr. Paine appeared to by only "performing complex neurological procedures in a failed attempt to combat [his] orthopedic and neurological physical problems in the hopes of avoiding surgery." Doc. 18 at 19; *see* Tr. 23, 428–44. On the summary of his wife's interview, Hooper argues the ALJ described only a portion of the statement to support the findings he has only mild limitations even though the part of the statement not described supports more significant limitations (because he is "in a lot of pain," he does little during the day and no longer grocery shops, he "jumps around [a lot] and does not concentrate as well as he used [to]," and he does not really watch movies with a storyline anymore). Doc. 18 at 20; *see* Tr. 248. Hooper further argues the ALJ's use of his wife's statement

to support the findings he has only mild limitations is "particularly confusing" because the ALJ gave her more detailed function reports no weight. Doc. 18 at 20; *see* Tr. 210–17, 271–79. According to Hooper, "The Commissioner cannot have it both ways: the ALJ cannot cite to a report of contact with Plaintiff's wife to say Plaintiff has no severe mental health issues, but then state more comprehensive versions of her experience are not consistent with the record. The ALJ again makes no attempt to reconcile the logical absurdity of these two positions." Doc. 18 at 20.

An ALJ must consider all relevant record evidence, 20 C.F.R. § 404.1520(a)(3), and the claimant's medical condition in its entirety, *Jamison v. Bowen,* 814 F.2d 585, 588 (11th Cir. 1987). An ALJ need not refer to every piece of evidence, *Dyer v. Barnhart,* 395 F.3d 1206, 1211 (11th Cir. 2005), but must state with "at least some measure of clarity the grounds" for the decision, *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984). If a court cannot determine from the ALJ's decision whether she considered a claimant's medical condition in its entirety, remand is warranted. *Jamison,* 814 F.2d at 588. An ALJ's determination may be implicit, but the "implication must be obvious to the reviewing court." *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983). A court will decline "to affirm simply because some rationale might have supported the ALJ's conclusion" because that "approach would not advance the ends of reasoned decision making." *Owens,* 748 F.2d at 1516.

At step two, an ALJ considers whether a claimant has a severe impairment or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment is an impairment that significantly limits a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a) (defining "non-severe impairment"). An impairment must be severe for at least 12 consecutive months. 20 C.F.R. §§ 404.1505(a), 404.1509, 404.1520(a)(4)(ii). "Step two is a threshold inquiry," *McDaniel v. Bowen,* 800 F.2d 1026, 1031 (11th Cir. 1986), acting as a "filter" to eliminate claims involving no substantial impairment, *Jamison,* 814 F.2d at 588. "[T]he finding of any severe

impairment ... whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe" satisfies step two. *Id.*

A claimant's RFC is the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). The SSA uses the RFC at step four to decide if the claimant can perform any past relevant work and, if not, at step five with other factors to decide if there are other jobs in significant numbers in the national economy he can perform. 20 C.F.R. § 404.1545(a)(5). The "mere existence" of an impairment does not reveal its effect on a claimant's ability to work or undermine RFC findings. *Moore v. Barnhart,* 405 F.3d 1208, 1213 n.6 (11th Cir. 2005). Though an ALJ need not identify all impairments that should be severe at step two, she must demonstrate she considered all of the claimant's impairments—severe and non-severe—in combination in assessing a claimant's RFC. 20 C.F.R. § 404.1545(a)(2).

Here, the Commissioner argues, and is correct, that even if the ALJ erred in finding Hooper's mental impairments non-severe, the error is harmless because she found he has severe impairments, prompting her to move to step three. *See Jamison,* 814 F.2d at 588. If that were the only issue concerning the ALJ's analysis of Hooper's mental impairments, remand would be unwarranted.

But Hooper raises other issues that are not harmless. Although the ALJ did not have to mention every piece of evidence, *see Dyer,* 395 F.3d at 1211, and used the form language indicating consideration of the entire record, by discussing only one of at least fourteen of Hooper's visits to Circles of Care and only one secondhand statement by Hooper's wife, by omitting from the discussion indications of serious problems, by referring to Dr. Paine's record as a "psychiatric evaluation," by failing to mention Hooper's GAF ratings indicating his treating doctors' view he had at least moderate symptoms or impairments on most occasions, by failing to explain why she was rejecting Hooper's credibility concerning his mental impairments, and by failing to explain why she had chosen to discuss only portions of only some of many records, the ALJ did not state with "at least some measure of clarity the grounds" for the

decision, *Owens,* 748 F.2d at 1516 (quoted), such that it cannot be determined whether she had considered his medical condition in its entirety, *Jamison,* 814 F.2d at 588, including all severe and non-severe impairments in combination, 20 C.F.R. § 404.1545(a)(2). Given the confusing way in which she analyzed his mental impairments, no implied reason for her findings is obvious. *See Tieniber,* 720 F.2d at 1255.[11]

The Acting Commissioner observes diagnoses of mental impairments alone do not establish functional limitations; argues the evidence establishes no mental limitations; observes medical records contain several normal examination findings; and observes state-agency consultants reviewed the evidence and also found Hooper's mental impairments are nonsevere.[12] Doc. 20 at 4–7. Those observations do not change that the ALJ's opinion lacks sufficient clarity and obvious implications to enable this Court to undertake an appropriate review. Although there may be good reasons supported by substantial evidence to find Hooper does not have severe mental impairments and resulting work-related limitations, this Court should decline "to affirm simply because some rationale might have supported the ALJ's conclusion." *See Owens,* 748 F.2d at 1516 (quoted).

Remand to reconsider Hooper's mental impairments is warranted.[13]

---

[11]Hooper frames his arguments concerning his mental-health impairments using the substantial-evidence standard. Whether that standard or the de novo standard for legal error in failing to consider the entire record and the claimant's condition as a whole is applied, remand is warranted.

[12]The state-agency consultants' opinions do not alone provide substantial evidence because, putting aside that their findings and summary of the evidence appeared incomplete, they did not have all of the records from Circles of Care when they rendered their opinions (they were missing records of visits after October 2015), including the one documenting a GAF rating of 49 and consideration of involuntary commitment. *See* Tr. 76–78, 89–92, 612.

[13]Hooper summarily asks for remand "for an award of benefits or, in the alternative, for further examination, analysis, and a hearing." Doc. 18 at 1. By failing to offer law, analysis, or argument, Hooper has waived the issue of whether remand for an

### B.   *Physical Impairments*

Hooper also argues substantial evidence does not support the ALJ's RFC assessment because she failed to address his "prevalent and longstanding" headaches and failed to include limitations in reaching, handling, and fingering arising from his shoulder, arm, and hand impairments. Doc. 18 at 21–22.

The ALJ summarized Hooper's testimony, including that he had had surgery on his hand and has migraine headaches for which he takes medication. AR 25. The ALJ also discussed treatment records relating to his neck, shoulder, and back, observing he had significantly improved with treatment and had often showed normal or adequate range of motion and normal strength, motor abilities, coordination, and tone on examination. Tr. 25–28

Concerning his headaches, Hooper is correct the ALJ did not discuss his headaches or hand-related impairments aside from briefly mentioning his testimony on them. But even the evidence he cites suggests little more than that he had those impairments and that they generally improved with treatment, *see, e.g.*, Tr. 298–99, 302–04, 306–08, 312–14, 316, 320–23, 325, 453–54 (reports of unresolved headaches, improvement of headaches with injections and medication, hand and elbow pain and tenderness, improvement of hand pain with injections, and a recommendation to use an elbow immobilizer and sleeve for four weeks).

Concerning the other physical impairments, substantial evidence supports the ALJ's RFC to the extent she found Hooper's shoulder impairment does not cause

---

award of benefits is warranted. In any event, remand for additional proceedings, rather than an award of benefits, is warranted. Remand is appropriate "where the ALJ has failed to apply the correct legal standards." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). A court may, however, reverse for an outright award of benefits if the Commissioner "has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Id.* Here, the evidence concerning Hooper's mental impairments does not establish his disability, or even the existence of mental functional limitations, beyond any doubt.

additional limitations. She explained his shoulder pain significantly improved with treatment, and physical examinations often showed normal or adequate range of motion and normal strength, motor abilities, coordination, and tone. Tr. 25–28. Substantial evidence supports those observations. *See* Tr. 297–99, 302, 304–05, 307, 312, 318, 320, 393, 397, 402, 432, 437, 471.

The evidence Hooper cites—that he had undergone two surgeries on his shoulder and that his pain-management physician had observed shoulder-related problems, including difficulty bringing his right arm behind his back, tenderness, decreased light touch on his shoulders, pain and muscle cramps, painful right-shoulder external rotation, and loss of radial pulses during Adson's maneuver, Tr. 48, 297–99, 303–05, 309, 312—is insufficient to undermine the substantial evidence supporting the ALJ's finding. *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) ("Even if the evidence preponderates against the … factual findings, we must affirm if the decision reached is supported by substantial evidence."). He points to no evidence requiring finding limitations in reaching, handling, or fingering arising from his shoulder impairments.

## C.   *Past Relevant Work*

Hooper also argues his past relevant work as a police captain was a composite job because part of his work was as a supervisor and part was as a field officer. Doc. 18 at 23–24. He argues that because the job has no DOT counterpart, the ALJ could not evaluate his ability to perform his past work as generally performed, and the RFC assessment precluded him from returning to it as he actually performed it. Doc. 18 at 24.

In a work history report, Hooper identified his past relevant work as "law enforcement captain," which required him to work 10 hours a day, 7 days a week. Tr. 221–22 (capitalization and underlining omitted). Under the section asking him to describe the job, he repeated the title but provided no other information. Tr. 222. Under other sections, he provided the following information. He used machines, tools,

or equipment; used technical knowledge or skills; and wrote, completed reports, or performed like tasks. Tr. 222. The job required him to stand 4 hours a day; sit, stoop, crouch, and reach 3 hours a day; climb, kneel, and write, type, or handle small objects 2 hours a day; and walk, crawl, and handle, grab, or grasp big objects 1 hour a day. Tr. 222. The job required him to lift office supplies, he frequently lifted 25 pounds, and the most he lifted was 100 pounds or more. Tr. 222. He supervised 28 people, and supervision accounted for 8 hours of his workday. Tr. 222. He would hire and fire employees and was a lead worker. Tr. 222.

At a March 2016 evidentiary hearing, Hooper testified as follows.

He worked as a lieutenant with the State of Florida supervising a squad of mostly plainclothes agents. Tr. 45. He often was in the field with them on patrol and making arrests. Tr. 45. He was promoted for the final four or five years of his career. Tr. 45. Before he retired, he "pretty much had the same thing except [he] had the responsibility of 20 or 30 or 40 agents of a 38-county" area. Tr. 45–46. He would accompany the agents during their operations, which included executing search or arrest warrants. Tr. 46. He supervised and participated in the operations. Tr. 46. His job required him to drive 150 miles two or three times a week from Tampa to other cities in Florida. Tr. 46–47. The department he worked for was not "a big agency where captains just sit behind a desk. Our supervisors have to be involved in the daily functions of our … police officers." Tr. 63. His job was not like a captain position with a bigger agency, where he would have been "sitting behind a desk all day." Tr. 63.

The ALJ asked the VE to classify Hooper's past relevant work. Tr. 62. She identified police officer, DOT number 375.263-014, and police captain, DOT number 375.267-026. Tr. 62. She described police captain as a highly skilled, light-exertion job based on the DOT description. Tr. 62. She explained the job was not light exertion as Hooper performed it because "it appears that he was doing the full or partly, some of the police officer work." Tr. 62. She stated that, as actually performed, "apparently he was more a working supervisor." Tr. 62. The ALJ asked whether Hooper could

perform his past work if he could lift and carry 20 pounds occasionally and 10 pounds frequently; occasionally climb ladders or scaffolds; occasionally stoop, kneel, crouch, and crawl; and would need to avoid concentrated exposure to hazards such as machinery and heights. Tr. 64. The VE responded he could perform the police-captain job as described in the DOT but not as Hooper actually performed it. Tr. 64. She testified he has skills that would transfer to the security-guard job, DOT number 372.667-038. Tr. 64–65. She opined that her testimony was consistent with the DOT. Tr. 66.

Hooper's counsel asked the VE whether she believed "the DOT's classification [of the police-captain job was] accurate." Tr. 67. She responded, "I differentiated that the DOT classifies it as light. I also stated that based on the way that the Claimant has described it, it was more medium which pretty much resembled the work of a police officer on the street because that is pretty much what he said he did." Tr. 67. When Hooper's counsel suggested his work might be a composite job, the VE testified:

> I did not state that his work is a composite job. If he was a working supervisor, then obviously he had to go out on the street. How often he would do those things, I am not sure and I cannot state specifically to that. He is the one that's describing his work as medium. I have to go, not only pretty much what he says, but I have to go by the DOT and what I understand a police captain does, it is a light job for a police captain. Now, whether or not he was much more specialized or having to do other tasks, that's different and, you know, that happens with employers. You sometimes would get assigned tasks which would be a working supervisor or a different type or additional task and may not necessarily be the particular job that you are supposed to be responsible for.

Tr. 68. Counsel responded, "[I]f he has those additional responsibilities, would the job not fall outside of the <u>Dictionary of Occupational Titles</u>' definition of a police captain and why they define it as a light job?" Tr. 68. The ALJ interjected, explaining she did not understand counsel's confusion because the VE testified the job was light as generally performed but medium as Hooper performed it, so a light RFC would prevent him from returning to the job as he performed it but not more generally. Tr.

68–69. Counsel dropped the line of questioning. Tr. 69. The ALJ accepted the VE's classification of Hooper's past work. Tr. 28.

"Past relevant work is work [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough … to learn to do it." 20 C.F.R. § 404.1560(b)(1). In determining whether a claimant can perform past relevant work, the SSA may obtain information about that work from the claimant and others and may consult a vocational expert ("VE") or the Dictionary of Occupational Titles ("DOT"). 20 C.F.R. § 404.1560(b)(2). A VE "may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy. Such evidence may be helpful in supplementing or evaluating the accuracy of the claimant's description of his past work." *Id.* A VE "may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy." *Id.*

"A former job performed … by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy. … [I]f the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be 'not disabled.'" SSR 82-61, 1982 WL 31387, at *2 (Jan. 1, 1982).

"There may be cases involving significant variations between a claimant's description [of a job] and the description shown in the DOT." *Id.* "[C]omposite jobs have significant elements of two or more occupations and, as such, have no counterpart in the DOT." *Id.* Past work might be a composite job "if it takes multiple

DOT occupations to locate the main duties of the [work] as described by the claimant." POMS DI 25005.020B.[14] An ALJ should find a claimant can perform a past composite job "only if he or she can perform all parts of the job." *Id.* Because composite jobs have no DOT counterpart, an ALJ should not consider whether the claimant can perform such a job as generally performed "unless [she has] evidence from other reliable occupational information" describing how the job is generally performed. *See* POMS DI 25005.025A (quoted). The SSA will evaluate situations involving significant variations between the claimant's and the DOT's descriptions of a job "according to the particular facts of each individual case" and may use a VE when "available documentation and vocational resource material are not sufficient to determine how a particular job is usually performed." SSR 82-61, 1982 WL 31387, at *2.

In *Jones v. Apfel*, the Eleventh Circuit held that when a VE's testimony conflicts with the DOT, the testimony trumps the DOT. 190 F.3d 1224, 1229–30 (11th Cir. 1999). In SSR 00-4p, issued after the Eleventh Circuit decided *Jones*, the SSA explained an ALJ must ask a VE about potential conflicts between the DOT and her testimony and elicit a reasonable explanation for any apparent conflict. SSR 00-4p, 2000 WL 1898704, *4 (Dec. 4, 2000). The Eleventh Circuit has continued to apply *Jones* after promulgation of SSR 00-4p. *See, e.g., Leigh v. Comm'r of Soc. Sec.*, 496 F. App'x 973, 975 (11th Cir. 2012); *Jones v. Comm'r of Soc. Sec.*, 423 F. App'x 936, 939 n.4 (11th Cir. 2011); *Miller v. Comm'r of Soc. Sec.*, 246 Fed. App'x 660, 661–62 (11th Cir. 2007).

---

[14]The Program Operations Manual System ("POMS") contains "publicly available operating instructions for processing Social Security claims." *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385 (2003). POMS may be considered persuasive even though it does not have the force of law. *Stoup v. Barnhart*, 327 F.3d 1258, 1262 (11th Cir. 2003).

In finding Hooper's past relevant work was as a police captain, the ALJ implicitly found the job was not a composite police officer/captain job. Substantial evidence supports that finding. After hearing Hooper's description of his work, the VE testified he worked as a police captain, described it as a light job as generally performed, and opined he could return to it as generally performed. Tr. 62–68. That he had duties exceeded those typically required of a police captain as defined in the DOT does not mean it meets the definition of "composite job." Hooper offers no authority supporting that the police-captain DOT entry is not the counterpart to his job as a police captain despite that he had additional responsibilities in the field. The VE's testimony indicates she believed his job was not a composite job but instead included "job duties significantly in excess of those generally required for the job." *See* SSR 82-61, 1982 WL 31387, at *2 (quoted). Hooper fails to explain why that opinion is wrong or why the ALJ was wrong to rely on it.

That Hooper's description of his job appears to be at odds with the DOT description of it makes no difference. Under *Jones*, the VE's testimony—that Hooper worked as a police captain and could perform that job as generally performed—provided substantial evidence for the ALJ's finding concerning Hooper's past work notwithstanding any inconsistency with the DOT. *See Jones*, 190 F.3d at 1229–30. Even if the ALJ had to resolve conflicts between the DOT and the VE's testimony, that obligation has limits. An ALJ need not independently investigate whether a conflict exists and may rely on a VE's testimony that no such conflict exists as long as there is no apparent conflict.[15] *See, e.g.*, *Thompson v. Comm'r of Soc. Sec.*, No. 2:15-cv-53-FtM-CM, 2016 WL 1008444, at *7–8 (M.D. Fla. Mar. 15, 2016) (unpublished); *Roberts v. Colvin*, No. 14-22929-Civ-COOKE/TORRES, 2015 WL 12533132, at *2 (S.D. Fla. Sept. 1, 2015) (unpublished); *Menendez v. Colvin*, No. 12-21505-CIV, 2015 WL 1311460, at *6 (S.D. Fla. Mar. 23, 2015) (unpublished); *Dickson v. Comm'r of Soc. Sec.*, No. 5:13-cv-48-OC-DNF, 2014 WL 582885, at *4–5 (M.D. Fla. Feb. 13, 2014)

---

[15] A conflict is "apparent" if it is "obvious enough that the ALJ should have picked up on it without any assistance." *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009).

(unpublished). That holding follows the purpose for resorting to expert testimony: to obtain "relevant evidence within [the expert's] expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work" and "supplement[] or evaluat[e] the accuracy of the claimant's description of his past work." *See* 20 C.F.R. § 404.1560(b)(2).

Here, the VE testified her testimony was consistent with the DOT. Tr. 66. When counsel suggested there was a discrepancy between the DOT description of the police-captain job and Hooper's description and suggested he might have performed a composite job, the VE explained she had not testified it was a composite job and her classification of the job was based on the combination of Hooper's description and her understanding of what a police captain does. Tr. 67–68. Even if the ALJ had to explore potential inconsistencies and elicit a reasonable explanation for them, the VE explained her reasoning, and any lingering inconsistency was not so obvious that the ALJ should have independently investigated it. The VE's explanation is not inconsistent with the SSA's guidance on past relevant work. *See* SSR 82-61, 1982 WL 31387, at *2 ("A former job performed … by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy," but a claimant should not be found disabled if he "can perform the functional demands and job duties as generally required by employers throughout the economy").

## V.     Recommendations[16]

I recommend:

(1)     reversing the Acting Commissioner's decision;

(2)     remanding the case to the Acting Commissioner with directions to reevaluate Hooper's mental impairments and take any other necessary action;

(3)     directing the Clerk of Court to enter judgment under sentence four of 42 U.S.C. § 405(g) for Hooper; and

(4)     directing the Clerk of Court to close the file.

**Entered** in Jacksonville, Florida, on February 12, 2018.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:     The Honorable Carlos E. Mendoza
       Counsel of Record

---

[16]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.